## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

MARC GRANT, by his next friend,
JEANNINE GRANT; CJT, by his next
friend, CT; RAFAELA GONZALEZ,
by her next friend, LOURDES GONZALEZ;
DANIEL GRAY; and BRANDEN PETRO, by
his next friend, RENEE HANANIA.

      Plaintiffs,

v.                                  Case No.: 4:24-cv-00384

JASON WEIDA, in his official
capacity as Secretary, Florida Agency
for Health Care Administration,

      Defendant.

_____/

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1. This action seeks declaratory and injunctive relief on behalf of five Plaintiffs who are adults with disabilities enrolled in the portion of Florida's Statewide Medicaid Managed Care Long-Term Care Program that provides home and community-based services (known as the "LTC Waiver"). To be eligible for the LTC Waiver, every enrollee must meet the level of care required for entry into a nursing facility.

2. The Agency for Healthcare Administration ("AHCA") has ultimate legal responsibility for the operation of the LTC Waiver. AHCA delegates its administration through contracts with seven private managed care plans ("Plans"). Among other obligations, these contracts require Plans to provide enrollees like Plaintiffs with case management, assessments of care needs, and adequate provider networks. Plans act as the gatekeepers for authorization of a standard set of home and community-based services ("HCBS").

3. AHCA is required to oversee Plans to assure compliance with federal and state authority and its own contracts with Plans. Part of that oversight is through AHCA's responsibility for maintaining a system for administrative fair hearings that meets due process standards and complies with other federal laws. AHCA's own Office of Fair Hearings employs and trains hearing officers to make final agency decisions on LTC Waiver services.

4. Plaintiffs have been harmed by AHCA's failure to require that Plans provide them with adequate and timely written notice of denial, reduction, or termination of services and other information needed to meaningfully challenge Plan decisions. This harm will continue until AHCA institutes corrective action.

5. The main purpose of any Medicaid HCBS Waiver is to provide community-based services to enrollees to avoid unnecessary segregation in institutions, a goal that is recognized in AHCA's adopted rules[1] governing the criteria used by Plans to authorize LTC Waiver services. Nonetheless, AHCA's management of the LTC Waiver runs counter to this goal. Plaintiffs have been harmed by AHCA's failure to oversee Plan practices in the administration of the LTC Waiver. Whether by AHCA's lack of oversight or, in certain instances, approval of Plan practices that ignore the actual care needs of Plaintiffs, Plans are allowed to make arbitrary decisions to deny or reduce critical services needed to safely maintain Plaintiffs in their homes. As long as AHCA continues to allow Plans to make service authorization decisions using criteria unrelated to their needs and unsupported by authority, Plaintiffs are at risk of institutionalization.

6. The pervasiveness of these problems is evident from the administrative final orders entered by AHCA's Office of Fair Hearings. These final orders show that the issues Plaintiffs are experiencing are systemic and that AHCA hearing officers repeatedly fail to hold Plans accountable to their obligations under state and federal law.

---

[1] *Parrales v. Senior*, Case No. 4:15-cv-424 (N.D. Fla.), also involved AHCA's oversight and administration of the Long-Term Care Waiver and resulted in AHCA's agreement to adopt rules to govern authorization of benefits.

7. AHCA's operation of the LTC Waiver violates the due process requirements found in the U.S. Constitution and the Medicaid Act, as well as the integration mandate and methods of administration clauses of the American with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504").

8. AHCA's failures in the administration of the LTC Waiver are working directly against the very purpose of the program: to provide adults with disabilities with the care that they need to stay in the community and avoid institutionalization. Until these failures are corrected, Plaintiffs will continue to suffer arbitrary reductions, terminations, and denials of services and the lack of meaningful due process to assert their need for services.

## JURISDICTION AND VENUE

9. This is an action for declaratory and injunctive relief for violations of:

a. The Due Process Clause of the Fourteenth Amendment to the United States Constitution;

b. The fair hearing requirements of the Medicaid Act, 42 U.S.C. § 1396a(a)(3);

c. Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; and

d. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

10. The Due Process and Medicaid Act claims are brought under 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Constitution and laws of the United States.

11. Plaintiffs' causes of action for disability discrimination are authorized by 42 U.S.C. § 12133 and 29 U.S.C. § 794(a).

12. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1343(a)(3) & (4).

13. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 & 2202 and Fed. R. Civ. P. 65.

14. Venue lies in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b), and in the Tallahassee Division, because the Defendant officially resides there. N.D. Fla. R. 3.1(A).

## PARTIES

15. Plaintiff Marc Grant is a 25-year-old man who has been enrolled in the LTC Waiver since 2019. He resides in Lake County with his family. His managed care plan is Sunshine Health. Mr. Grant brings this action by his next friend, Jeannine Grant, because he cannot adequately represent himself or understand the nature of the claims.

16. Plaintiff Rafaela Gonzalez is an 84-year-old woman enrolled in the LTC Waiver since 2022. She resides alone in Miami-Dade County. Her managed care plan is Molina. Ms. Gonzalez brings this action by her next friend, Lourdes Gonzalez, because she cannot adequately represent herself or understand the nature of the claims.

17. Plaintiff CJT is a 65-year-old man enrolled in the LTC Waiver since 2016. CJT resides in Broward County in an apartment with his sister. His managed care plan is Sunshine Health. CJT brings this action by his next friend, CT, because he cannot adequately represent himself or understand the nature of the claims.

18. Plaintiff Daniel Gray is a 38-year-old man who has been enrolled in the LTC Waiver since 2017. He resides with his parents in Pinellas County and has Humana as his managed care plan.

19. Plaintiff Branden Petro is a 22-year-old man enrolled in the LTC Waiver since 2023. He resides with his family in Hillsborough County. His managed care plan is Simply Health. Mr. Petro brings this action by his next friend, Renee Hanania, because he cannot adequately represent himself or understand the nature of the claims.

20. Defendant Jason Weida is the Secretary of the Florida Agency for Health Care Administration ("AHCA") and is sued in his official capacity.

AHCA is the chief health policy and planning entity for the state and is the "single state agency" responsible for administering Florida's Medicaid program and Florida's LTC Waiver.  Fla. Stat. § 20.42(3) (2023); *see* 42 U.S.C. § 1396a (a)(5). AHCA is also responsible for the final administrative decision for Medicaid LTC Waiver challenges in its Office of Fair Hearings. Fla. Stat. § 409.285(2) (2023).

21. Defendant Weida is responsible for the supervision and control of AHCA and its divisions and is ultimately responsible for ensuring that AHCA's services for people with disabilities are provided in conformance with federal law.

22. AHCA is a public entity within the meaning of the Americans with Disability Act.

23. AHCA receives federal financial assistance and is therefore subject to the requirements of the Rehabilitation Act.

24. At all times relevant to this Complaint, Defendant Weida or his predecessor acted under color of state law and knew, or should have known, of the policies, practices, acts, and conditions alleged herein.

## LEGAL FRAMEWORK

### Medicaid

#### *Administration of Florida's LTC Waiver*

25. The Medical Assistance Program ("Medicaid") is a joint federal-state program established under Title XIX of the Social Security Act, 42 U.S.C. § 1396-1396w-5 ("Medicaid Act") to ensure that rehabilitation, medical care, nursing, and other services are provided to low-income and indigent people. 42 U.S.C. § 1396 *et seq.* States are required to administer Medicaid "in the best interests of recipients." *Id.* § 1396a(a)(19).

26. States are not required to participate in Medicaid but must comply with federal Medicaid statutes and implementing regulations if they do. 42 U.S.C § 1396, 1396a, 1396c.

27. Federal law requires participating states to administer Medicaid through a "single state agency." 42 U.S.C. § 1396a(a)(5); 42 C.F.R. 431.10(b)(1). While the single state agency may delegate certain functions, it is prohibited from delegating the authority to supervise managed care plans or to "develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(c).

28. To participate in Medicaid, states must submit their plans for administration of Medicaid programs for approval by the Centers for

Medicare and Medicaid Services ("CMS"), a federal oversight agency within the U.S. Department of Health and Human Services. The basic Medicaid program, which provides hospitalization, out-patient care, and other medical benefits, is operated through an approved State Plan.

29. Nursing facility services are a mandatory benefit under Medicaid. Fla. Stat. § 409.905(8). This means that if an individual on Medicaid meets a nursing facility level of care, the State must provide that benefit with reasonable promptness. Nursing facility services provide 24-hour medical and nursing care. Fla. Admin. Code R. 59G-4.200, 1.1 (Florida Medicaid Nursing Facility Services Coverage Policy May 2016). These services are all-inclusive and provided every day of the year. 42 C.F.R. § 483.440. Nursing facilities must provide sufficient staff (both nurses and nurse aides) "to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being ...." 42 C.F.R. § 483.71.

30. Pursuant to federal law, states may also choose to provide home and community-based services ("HCBS") through a process requiring federal approval of a detailed application and "waiver" of certain provisions of the Medicaid Act. 42 U.S.C. § 1396n(c). Under this section, HCBS must be provided "pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such

services the individuals would require the level of care provided in a hospital or a nursing facility . . .." *Id.* at (c)(1). All HCBS enrollees choose to receive Medicaid long-term services and supports to allow them to live in the home and community rather than receive care in a nursing facility.

31. AHCA has received federal approval to operate the LTC Waiver as a Medicaid HCBS Waiver for adults (age 18 and up) with disabilities or frail elderly individuals (age 65 and up) who meet a nursing home level of care. For each offered service, Florida's LTC Waiver application to CMS states that the Plans have "the maximum flexibility needed to ensure the individual receives the services necessary to maintain health, safety, and welfare to remain in a community setting."[2]

32. With approval by CMS, federal law allows for the provision of HCBS services through a managed care model. 42 U.S.C. § 1396n. When a state contracts with managed care plans ("Plans") to deliver Medicaid services, the state must set out its process for quality assurance, monitoring, and periodic review. 42 U.S.C. § 1396u(2).

33. Florida's LTC Waiver received federal approval to operate under a managed care model. AHCA currently contracts with seven different Plans

---

[2] Approved Application found at: https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/81391. *See, e.g.,* p. 51, accessed on September 4, 2024.

to act as the gatekeeper for authorization and delivery of Medicaid services to enrollees in exchange for a capitated rate. These Plans not only provide HCBS and nursing facility care, but also comprehensive medical services consistent with State Plan benefits known as "Managed Medical Assistance." LTC Waiver enrollees, like Plaintiffs, are assigned or choose a "comprehensive" Plan that is responsible for both Managed Medical Assistance and LTC Waiver services.

34. All LTC Waiver Plans must provide the same set of mandatory benefits, which are defined in the State's application to CMS. These benefits do not have a cap on amount if they are determined to be "medically necessary."

35. The LTC Waiver is also governed by state statutes and implementing rules. Florida adopted rules effective April 23, 2017, setting out the criteria for authorization of benefits offered through the LTC Waiver. These rules are compiled in the Florida Medicaid Long-Term Care Program Coverage Policy ("Coverage Policy.") The Coverage Policy states the goal of the program: "[M]anaged care plans (LTC plans) are required to provide an array of home and community-based services that enable enrollees to live in the community and to avoid institutionalization." Fla. Admin Code R. 59G-4.192.

36. Consistent with Florida's federal waiver application, the Coverage Policy sets out definitions of key terms and benefits and documentation requirements.

37. Both the Coverage Policy and federal regulations require that Plans develop a "person-centered care plan" led by the enrollee or the enrollee's representative. 42 C.F.R. § 441.301(c)(2).  The care plan must reflect the paid and unpaid services and supports that will assist the individual in meeting the care plan goals including "natural supports" which are defined as "unpaid supports that are provided *voluntarily* to the individual in lieu of 1915(c) HCBS waiver services and supports." *Id.* at subsection (v) (emphasis added).

38. The Coverage Policy mandates that Plans use two different assessments, the 701B Comprehensive Assessment and the LTC Supplemental Assessment. These two assessments form the basis of an enrollee's care plan and are required prior to authorization of services.

39. The Comprehensive assessment is an individualized assessment of medical, developmental, behavioral, social and environmental status of the enrollee using a form known as the "701B."

40. The LTC Supplemental assessment is required to capture the level of natural supports available to the enrollee and must document information

12

on the natural support's stress levels, medical limitations, other responsibilities, willingness to participate in care, and the amount of time they can commit to providing care.

41. These assessments are used for all service authorization decisions and are administered by Plan case managers at initial determinations, annual reauthorizations and quarterly visits. They may also be done for unscheduled Plan reviews, changes of condition or circumstances, requests for an increase in services, and reauthorization decisions.

42. Case managers (also known as "care coordinators"), employed by the Plans, are provided to all LTC Waiver enrollees with the primary purpose of assisting enrollees in gaining access to services. The case manager is responsible for facilitating assessments and developing the care plan, which is the primary written document reflecting the total care needs of the individual and the services and supports that have been authorized to address those needs.

43. Plan employees review these assessments and care plans to render decisions about the type and amount of services to authorize.

44. Direct care services are those provided through face-to-face contact with an enrollee. The most frequently authorized direct care services for enrollees in the LTC Waiver are a grouping of services described as "non-

skilled," including Personal Care, Adult Companion Care, Homemaker and Respite. Skilled direct care services include Attendant Nursing Care and Intermittent Skilled Nursing.

45. Direct care services are defined in both the LTC Waiver application to CMS and in AHCA's own rules in the Coverage Policy, and include Personal Care, Adult Companion Care, Homemaker, Respite Care, and Attendant Nursing Care.

46. Personal Care services are intended to provide assistance with activities of daily living ("ADLs") and instrumental activities of daily living ("IADLs"). ADLs include bathing, grooming, dressing, eating, toileting or incontinence care, transferring and mobility. IADLs include light housework, laundry, shopping, meal preparation, medication or money management and transportation.

47. Adult Companion Care provides non-medical care, supervision when necessary to protect the health, safety and well-being of the enrollee, or social enrichment provided to a functionally impaired enrollee. Companions may also assist or supervise the enrollee with tasks such as meal preparation, laundry, or light housekeeping.

48. Homemaker services are general household activities (such as meal preparation) and routine household care (including laundry and pest

control) provided by a trained homemaker, when the individual regularly responsible for these activities is temporarily absent or unable to manage these activities.

49. Respite Care services are provided on a short-term basis due to the absence of, or need to relieve, the enrollee's natural supports on a planned or emergency basis.

50. Skilled direct care services include Attendant Nursing Care services which is medical assistance provided by a licensed nurse in the home when the needs of an enrollee require more individual and continuous care than an intermittent skilled nursing visit.

51. Direct care services are not capped at a specific amount but are authorized based upon the medical necessity of the enrollee's care needs reflected in the approved care plan.

52. For purposes of LTC Waiver direct care services, "medical necessity" is defined to mean that the services must not be in excess of an enrollee's needs, must be cost effective, and not solely for convenience. In addition, the service must enable the enrollee to either maintain or regain functional capacity or to access the community benefits, achieve care plan goals, and live in their chosen setting.

### *Medicaid Enrollees' Notice and Appeal Rights*

53. Medicaid enrollees must be given the opportunity for a fair hearing on denials or delays of their claims for medical assistance. 42 U.S.C. § 1396a(a)(3); *see also* 42 C.F.R. § 431.220(a)(1). Federal regulations specifically require the hearing system to meet the Constitutional due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970). 42 C.F.R. § 431.205(d).

54. The Medicaid regulations set out a requirement of timely and adequate written notice of a Plan's "adverse benefit determination." 42 C.F.R. § 438.404. "Adverse benefit determination" is defined to include Plan decisions to reduce, suspend or terminate a previously authorized service or to deny or limit authorization of a requested service "including determinations on the type or level of service, requirements for medical necessity, appropriateness, setting or effectiveness of a covered benefit." 42 C.F.R. § 438.400. An adverse benefit determination also occurs when Plans fail to act in the timely manner. *Id.*

55. Notices of adverse benefit determinations ("NABD") must be sent to Medicaid enrollees at least ten days before the proposed action is taken. 42 C.F.R. §§ 438.404(c), 431.211. The notice must explain the reasons for the adverse benefit determination, the right to appeal, the procedures for

appealing, how to request expedited resolution, and the right to continuation of current services pending the appeal. 42 C.F.R. § 438.404(a)-(b).

56. HCBS waiver enrollees have the right to both an internal appeal and a fair hearing. The internal appeal is conducted by the Plan itself and must be exhausted before an enrollee can request a fair hearing. 42 C.F.R. § 438.402(c). Notices of the Plan's appeal resolution ("NPAR") are required to be sent to enrollees and must include information on the right to request a fair hearing and how to request continuation of current benefits pending the fair hearing decision. 42 C.F.R. § 438.408.

57. On request, enrollees or their representatives are entitled to timely receive, free of charge, a complete copy of their own case file from their Plan. The case file includes medical records, other documents and records, and any evidence considered, relied upon or generated by the Plan in connection with an appeal. 42 C.F.R. § 438.406(b)(5); *see also* Fla. Admin. Code R. 59G-1.100(12) (requiring access to these files prior to fair hearings).

### AHCA Oversight of the LTC Waiver

58. Federal regulations set out extensive requirements for a State to address in the oversight of Medicaid managed care programs, including providing reports on State fair hearings involving managed care plans. 42 C.F.R. § 438.66(e)(2)(v). AHCA's oversight is also set out in the detailed

contracts between AHCA and the managed care plans that are part of the LTC Waiver program. These contracts provide for submission of reports by Plans as well as sanctions and corrective actions for non-compliance with contract provisions.[3]

59. AHCA, as the single State Medicaid agency, has ultimate legal responsibility for maintaining a system for fair hearings that meets due process standards and complies with other federal laws, including Section 504 and the ADA. 42 C.F.R. §§ 431.10(b)(3); 431.205.

60. AHCA has established its own Office of Fair Hearings to be "responsible for a final administrative decision in the name of the agency" on all appeals related to the Statewide Medicaid Managed Care program, including the LTC Waiver. Fla. Stat. § 409.285(2). AHCA employs and trains hearing officers to preside over these administrative challenges and sends "Fair Hearing Liaisons" to attend and monitor the fair hearings as observers. The AHCA Office of Fair Hearings is located within AHCA's own General Counsel's Office, which oversees the quality and accuracy of final decisions of AHCA hearing officers.

---

[3] *See* AHCA Contract No. FPOXX, Att. II, Ex. II-B (Apr. 1, 2023), available at https://ahca.myflorida.com/medicaid/statewide-medicaid-managed-care/2018-2024-model-health-plan-contract, accessed Sept. 14, 2024.

## Americans with Disabilities Act

61. Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity or be subjected to discrimination by such entity."  42 U.S.C. § 12132.

62. The ADA prohibits unnecessary segregation of people with disabilities into institutions, requiring that a public entity shall administer its services, programs and activities in "the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

63. Public entities "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

64. "A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's

program with respect to individuals with disabilities...." 28 C.F.R. § 35.130(b)(3).

65. The ADA protects people with disabilities whom the state or its designees have placed at serious risk of unnecessary segregation and institutionalization. A qualified individual need not suffer the actual harm of institutionalization before seeking relief under the ADA.

66. States' obligations under the ADA are independent from the requirements of the Medicaid Act, and the ADA may require states to provide services beyond what a state currently provides under Medicaid. A state "must ensure" that each Plan complies with applicable Federal and State laws, specifically Title II of the ADA. 42 C.F.R. § 438.100(d).

## Section 504 of the Rehabilitation Act

67. Section 504 of the Rehabilitation Act of 1973 (Section 504) provides comparable protections against disability discrimination by recipients of federal funds.  It prohibits discrimination against individuals with disabilities by any program or activity, including any department or agency of a state government receiving federal financial assistance. 29 U.S.C. § 795(a), (b).

68. Section 504 prohibits the unwarranted segregation of people with disabilities and requires services, programs and activities of state and local

governments to be administered in "the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d); 45 C.F.R. § 84.76(b).

69. A program violates the integration mandate when it fails "to provide community-based services that results in institutionalization or serious risk of institutionalization," including but not limited to "planning, service system design, funding, or service implementation practices." 45 C.F.R. § 84.76(d)(4). "Qualified individuals with disabilities need not wait until the harm of institutionalization or segregation occurs to assert their right to avoid unnecessary segregation." *Id.*

70. Section 504 prohibits federal funds recipients from, directly or through contractual or other arrangements, utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entities program with respect to individuals with disabilities.  28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

## STATEMENT OF FACTS

### AHCA'S Failure to Assure Compliance with Law

#### *Deficient Notices and Lack of Information*

71. The Notice of Adverse Benefit ("NABD") template approved by AHCA and used by Plans sets out a section for Plans to provide a narrative of "The facts that we used to make our decision." However, Plans have a practice of issuing notices containing generic information that does not inform enrollees of the individualized reasons for the reduction or denial of services. For example, Plaintiff Grant's NABD stated that "based on the assessment of the member's care needs and household and caregiver status," the Plan will reduce services. Plaintiffs Gonzalez and CJT have also received generic NABDs.

72. Plans have a practice of issuing notices that list "facts" that have nothing to do with an enrollee's own need for services. For example, Plaintiff Gray, who is quadriplegic, received a NABD stating that he had not been recently hospitalized, does not leave his home "without someone (wandering)," and does not have trouble making his needs known. By setting out "facts" such as these as grounds for the decision, enrollees are led to believe that these are criteria for authorization of the impacted service. This has also happened to Plaintiff Petro.

73. Plans also have a practice of issuing notices that refer to internal policies, guidelines or rules as authority for a decision without providing the policy or rule or without referencing which part of the policy or rule is being used for authority. All Plaintiffs have received notices that do not specify which part of a lengthy policy is being used for authority. Plaintiffs Grant, Gonzalez, and Gray were issued notices that cite to internal policies not provided with the notice.

74. AHCA hearing officers have a practice of quoting the part of the Plan's notices that explain the decision. However, AHCA's Final Orders rarely, if ever, mention or address deficiencies in the notices.

75. Plans fail to ensure timely delivery of notices informing enrollees of its service authorization decisions. Enrollees frequently receive written notice sent by US Postal Service a week or more after the date on the notice, giving them little or no time to request continuation of services that are to be reduced or terminated. Plans also mail notices that give the date of termination or reduction of a service as the same day as the date of the notice. Under 42 C.F.R. § 435.918, enrollees have the option of having notices sent electronically, but AHCA does not require Plans to provide this option. Plaintiffs Grant, CJT, and Petro have received late notices and have requested electronic notification without response.

76. Plans fail to assure that enrollees' services would continue pending an appeal and fair hearing challenging a Plan's decision to reduce or terminate services. Through AHCA fair hearings and AHCA's complaint system for Medicaid recipients, AHCA knows or should know that Plans are terminating enrollee services without proper notice and the opportunity to request services to continue pending appeal. Plaintiffs Grant, CJT, and Petro have all experienced a problem with continuation of benefits during their appeal process.

77. Plan case managers are responsible for helping enrollees access services and put together a care plan that will meet their needs. However, enrollees are given conflicting or confusing information about which direct care services are appropriate for their particular needs. For example, both Plan Member Handbooks and AHCA's website describe Companion services and Homemaker services almost the same. Homemaker is defined as the "service that helps you with general household activities, like meal preparation and routine home chores," and Adult Companion Care is stated to be the service that "helps you fix meals, do laundry and light housekeeping," with no mention of social enrichment or supervision.[4]

---

[4]   https://ahca.myflorida.com/medicaid/statewide-medicaid-managed-care/long-term-care-program/find-out-about-long-term-care-services, accessed on Sept. 8, 2024.

78. Inaccurate information about service definitions results in an inability for enrollees to effectively challenge Plan decisions on those services.

79. Both federal and state authority (42 C.F.R. §438.406(b)(5); Fla. Admin. Code R. 59G-1.100(12)) require that Plans give enrollees free access to their complete case file to adequately prepare for appeals or fair hearings. Plans ignore requests for case files, do not respond in a timely manner, or respond with incomplete information, as happened to all Plaintiffs.

80. Enrollees are further prevented from having basic information about access to LTC Waiver services by a practice of Plan case managers requiring the enrollee or their legal representative to sign a tablet screen assenting to the care plan without suggesting or allowing that the care plan be read first. Plaintiffs Grant, Gonzalez, CJT and Petro experienced this practice.

81. In its application to CMS to renew the LTC Waiver in 2022, AHCA states that it received public comments about concerns that the care planning process was "overwhelming" for recipients and that care plans were "being completed electronically, including signature collection," which was confusing for enrollees. AHCA stated that it took no action on these

comments.[5]

82. AHCA has failed to correct the Plan practices of sending deficient and untimely notices and failing to provide information Plaintiffs need to understand service authorization decisions. Without adequate notice or access to information about the care planning from their case file, Plaintiffs will continue to be unable to meaningfully challenge Plan decisions

83. The State's process does not provide an adequate means that is sufficient to remedy these procedural deprivations.

### *Decision-making Not Based on Care Needs*

84. Plans use different tactics to deny, reduce or terminate services. These include use of arbitrary limits on services that are unrelated to actual care needs, failure to administer assessments in a way that results in accurate information, and unjustified reliance on "natural supports."   AHCA's failure to correct these practices results in a system that produces arbitrary and inconsistent results whenever there are changes in conditions, need for increased services, reauthorizations, or at any of the many times throughout the year when new assessments are given.

---

[5] Application for 1915(c) HCBS Waiver: FL.0962.R02.00 - Apr 01, 2022, p. 9, found at: https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/81391. *See, e.g.,* p. 51, accessed on September 8, 2024.

85. Plans use criteria for authorization of services that are not included in rule definitions of services and are not based on an enrollee's actual needs. Every Plaintiff has been impacted by the use of these arbitrary criteria.

**Personal Care**

86. Plans make decisions about Personal Care services using task-based criteria and policies which assign a certain amount of "reasonable" time to various tasks related to ADLs (such as bathing and toileting) and then arrive at a number of hours per week unrelated to an enrollee's actual needs. Plaintiffs Grant and Gonzalez were impacted by this.

87. Even though Personal Care services are defined as providing assistance with both ADLs and IADLs, these task-based criteria focus on ADLs but ignore an enrollee's needs for IADLs, such as transportation or medication management.

88. Use of task-based criteria also fails to consider enrollees' care needs in between specific tasks when the service provider must be available to provide hands-on care or supervision for the enrollee's safety.

89. The task-based policies are not consistent about the allowed time for each task. For example, the State Plan Personal Care Services Coverage Policy allows for up to 30 minutes per bath, up to 30 minutes for grooming

and skin care (including brushing teeth, shaving, applying lotion), and 15 minutes for hair care, while Sunshine Health's Personal Care criteria, approved by AHCA, allows for up to 45 minutes per bath but only 15 minutes for both dressing and grooming. *See* Fla. Admin. Code R. 59G-4.215; Sunshine Health Policy LT.UM.09 Long Term Care Ancillary Service Criteria, at 17-19.

90. The policies assume that assistance with a task will only be needed at certain prescheduled times during the day. For example, the State Plan Personal Care Services Coverage Policy only allows for up to 15 minutes for assistance with transferring per every two hours, or 45 minutes in toileting assistance per day, though these activities occur on an unscheduled basis throughout the day. Fla. Admin. Code R. 59G-4.215.

91. In addition, neither of the State-sanctioned LTC Waiver assessments (the 701B and the LTC Supplemental) elicit information on how many times a task is required for an individual enrollee throughout the day or how long it takes to accomplish a task.

92. AHCA's Office of Fair Hearings has issued final orders that affirm reliance on the task-based criteria used by Plans and overemphasis on ADLs for authorization of Personal Care services.

93. Plans also set other arbitrary restrictions on Personal Care unrelated to need. For example, as set out below, Plaintiff Gray was advised in his NABD that one of the reasons for not authorizing his requested increase in Personal Care services was that he was not a wanderer. Mr. Gray has quadriplegia. At least one Plan uses restrictions on authorization of care at night, such as requiring that the enrollee live alone, need frequent repositioning, or have severe incontinence.

**Adult Companion Care**

94. Plans curtail the use of Adult Companion Care by restricting the type of conditions or care needs that justify authorization, some even setting out a list of "trigger diagnoses" that are part of approval criteria. As set out below, Plaintiff CJT was impacted by restrictions on Companion services that were not related to his legitimate needs.

95. Rather than authorizing Adult Companion Care for "social enrichment" as set forth in the rule definition, Plans deny or reduce Companion services when an enrollee lives with another person or has paid supports with the rationale that there is no "lack of social isolation."

96. Plans also place arbitrary restrictions on when supervision can be authorized or fail to consider the need for supervision as part of the required array of services an enrollee needs.

97. AHCA's Office of Fair Hearings has issued Final Orders that affirm approval of Plans' restrictive use of Adult Companion Care regardless of an enrollee's actual need.

**Respite Care**

98. Respite Care services are intended to relieve a planned or emergency absence of a caregiver, yet decisions on requests are not made by Plans until after the absence or emergency need has already begun.  As set out below, Plaintiff Gonzalez was impacted by delayed and inadequate authorization of Respite services.

**Attendant Nursing Care**

99. Plans use arbitrary restrictions to deny Attendant Nursing Care services, for example, justifying denial if the enrollee is not on a ventilator, does not use a feeding tube, or does not require complex wound care. AHCA has approved Plans' restrictive use of Attendant Nursing Care services regardless of an enrollee's actual need.

**Inadequate and Incorrect Assessments**

100. Another way that services decisions lead to arbitrary results is the use of assessments that contain inadequate or incorrect information. Every Plaintiff has been impacted by this issue.

101. Both the 701B and the LTC Supplemental assessments are required by the Coverage Policy and administered by case managers employed by the Plans. Both assessments are inconsistently administered or applied among Plans and even among case managers of the same Plan.

102. The functional needs and changing conditions of enrollees are intended to be captured in the 701B comprehensive assessment which are used by Plans to make service authorization decisions. Despite the critical role they play in making sure enrollees receive adequate care, these assessments are not provided to the enrollee or their representatives for review prior to their use in decision-making, denying enrollees the opportunity to correct errors in the assessment before the Plan denies or reduces services. None of the Plaintiffs has ever been provided a copy of or been given the opportunity to review their 701B comprehensive assessment before it was used to deny or reduce services.

103. Plans are required to complete an LTC Supplemental assessment to document the enrollee's need for supervision and to document the level of natural supports that are willing to provide. This requirement is in place for the health and well-being of the enrollee.

104. When a Plan incorporates voluntary services into an enrollee's plan of care without verifying the ability and willingness of the caregiver, Plan service authorization decisions on paid direct care services will be arbitrary.

105. Every Plaintiff has had a LTC Supplemental assessment that was incomplete, filled out incorrectly, or explained poorly by their case manager, even when Plan decisions reducing, denying, or terminating services have relied on the availability and ability of voluntary natural supports.

106. For the LTC Supplemental assessment, Plans have a practice of failing to verify the availability and ability of natural voluntary supports with the person expected to provide care. This leads to inaccurate information on the amount of care they are able to provide, which is then used by the Plan to justify denial or reduction of an enrollee's services. Plaintiffs Grant, Gonzalez, Gray and Petro experienced this problem.

107. AHCA's Office of Fair Hearings has issued decisions that rely solely on the information in a 701B assessment even while recounting evidence that the information in that document is incorrect or outdated.

108. In contrast, AHCA Final Orders rarely even refer to the LTC Supplemental assessment but instead confirm a Plan's assumption that natural support will fill in gaps in service authorizations or place an unexpected burden on enrollees to show why natural supports are

unavailable. In an analysis of 201 Final Orders involving challenges to direct care service denials or reductions issued between June 2017 through June 2021, 183 involved Plan reliance on an enrollee's use of natural supports. Of those, only two of 183 even mention the LTC Supplemental assessment in the decision.

109. Plans have a practice of failing to consider the opinions and recommendations of treating physicians during the service authorization process. AHCA has failed to correct this practice.

110. Plans have a practice of reducing or terminating services that have previously been determined to be medically necessary when there has been no improvement in the enrollee's condition or circumstances. Enrollees, like Plaintiffs Grant, Gonzalez, CJT and Petro, have experienced this, some repeatedly. AHCA Final Orders affirm this practice.

**Limitations on Determining an Array of Services**

111. AHCA does not require Plans to make decisions that are consistent with the goal of the LTC Waiver: to provide an array of services sufficient to allow enrollees to live in the setting of their choice and avoid institutionalization. This goal reflects the reality that HCBS services work in concert to ensure that the health and welfare of enrollees who meet a nursing facility level of care can be maintained without having to be institutionalized.

112. Enrollees are given conflicting and confusing information about which direct care services are appropriate for their needs, or how services should be combined to address all needs.

113. Plans review service authorizations by evaluating each direct care service separately rather than determining the array of services needed by enrollees to remain in the community. As an example, Personal Care services are denied as inappropriate for supervision without informing the enrollee that Adult Companion Care would meet that need. Similarly, Adult Companion Care is denied as inappropriate for hands-on care without informing the enrollee that Personal Care services would meet that need.

114. AHCA hearing officers also routinely approach each service authorization decision separately rather than recognizing that direct care services must work in combination to meet enrollees' needs.

115. Criteria used to authorize different direct care services varies among Plans and even among the same Plan or same enrollee. Enrollees previously approved for a service may have that service later reduced or terminated using a different set of criteria. This happened to Plaintiffs Grant, Gonzalez, CJT, and Petro.

116. AHCA's hearing officers use their own administrative rules to conclude that their jurisdiction is limited to the issues and services delineated

in Plan written notices. Hearing officers have also declined to take jurisdiction to consider enrollee requests to have services continued or reinstated pending the final order, as happened to Plaintiff CJT. These limitations on jurisdiction preclude enrollees from challenging a Plan's mishandling of requests for services (e.g., issuing an adverse benefit determination for the wrong service, a different service than the enrollee intended, or a different amount) or a Plan's failure to address care needs through an appropriate array of services (e.g., denying one type of service when a different type of service is clearly justified).

117. Relying on a restrictive view of jurisdiction dependent on the Plan's notices, decisions by hearing officers either wholly approve or wholly deny a service, even when the record reflects that the actual needs of the enrollee demand a more nuanced result. Enrollees who need some, but not all, of requested services or need a different direct care service experience long delays in receipt of needed services as they must start over with new service requests, guessing at the level or type of service that might be approvable.

118. Plans have a practice of using arbitrary decision-making criteria to make service authorization decisions that are not designed to provide the services that enrollees need to live safely in the community. By failing to

correct these practices, Defendant places Plaintiffs at risk of having to enter nursing homes to receive the all-inclusive care and supervision that is provided in that setting.

## Plaintiffs' Allegations

### *Marc Grant*

119. Plaintiff Marc Grant is a 25-year-old man who has been enrolled in the LTC Waiver since 2019. His managed care plan is Sunshine Health.

120. Mr. Grant was born with rare progressive genetic disorders causing developmental disabilities and chronic life-threatening medical conditions that have damaged his muscles, nerves, joints, and connective tissue. He is a heart transplant recipient and severely immune compromised. His care is further complicated by his non-verbal status, features of autism, and he has a severe sleep disorder.

121. Mr. Grant requires physical assistance for all his care needs. He is at high risk of falling and must always be supervised for his health, safety and wellbeing.

122. Mr. Grant's condition has progressively worsened over time.

123. Mr. Grant lives with his mother, father, grandfather and two nephews and a niece. His grandfather is under hospice care. His nephews and niece are all minors who have been diagnosed with developmental

disabilities.

124. Up until January 23, 2024, Mr. Grant was authorized to receive 84 hours per week of Personal Care services.

125. Sunshine Health issued a Notice of Adverse Benefit Determination ("NABD") dated January 23, 2024, stating that Mr. Grant's Personal Care services would be reduced to 48 hours a week as of February 6, 2024.

126. The NABD failed to provide an individualized and specific reason for the decision as required by law. It simply stated that the reduction was "[b]ased on the assessment of the member's care needs and household and caregiver status."

127. While the NABD cited Sunshine Health Policy LT.UM.09 Long Term Care Ancillary Service Criteria as support for the decision, it failed to specify what section of the 25-page policy was relied upon. This policy, which includes task-based criteria for determining the amount of services to authorize, was not provided to Mr. Grant until it was included in Sunshine's evidence during the fair hearing process.

128. The NABD was not received by Mr. Grant until February 3, 2024, eleven days after the date on the notice.

129. Mr. Grant's mother, who is also his co-Guardian Advocate, filed

an internal appeal with Sunshine Health after being told by the case manager of the decision to reduce services.

130. On January 29, 2024, Sunshine Health issued a Notice of Plan Appeal Resolution ("NPAR") denying Mr. Grant's appeal and upholding the reduction because "the member lives with multiple family members who can assist as informal support." The NPAR does not say which family members were expected to assist.

131. Mr. Grant did not receive the NPAR until February 10, 2024, twelve days after the date of the NPAR.

132. Mr. Grant, through his attorney, requested that notices be sent by electronic format, but Sunshine has not responded to this request.

133. The NPAR stated that services were reduced effective January 29, 2024, the date the NPAR was issued. Mrs. Grant made repeated phone calls to Sunshine Health to ask that services be continued pending a fair hearing decision and filed a formal complaint with AHCA. There was no confirmation of continuation of services until Mr. Grant's counsel became involved.

134. The decision-making process used by Sunshine relied upon arbitrary limitations on services unrelated to Mr. Grant's actual care needs and on assessments that did not reflect his needs as they were improperly

administered, included incorrect information, and were never validated. AHCA is aware of these issues and has failed to correct them.

135. Sunshine Health contracted with an organization called CareBridge to conduct a review of Mr. Grant's care needs and recommend services. CareBridge utilized a task-based assessment that sets out the "reasonable" amount of time it might take to help a person bathe, dress, groom, eat, toilet, transfer, and assist with mobility. Adding up these minutes, CareBridge issued a report to Sunshine on January 23, 2024, recommending that Mr. Grant be provided only 48 hours per week of Personal Care. CareBridge also recommended 10 hours per week of Homemaker services (also adding up time for tasks) and seven hours per week of Adult Companion service.

136. Sunshine Health also calculated Mr. Grant's care needs using its own task-based criteria for Personal Care services (Sunshine Health Policy LT.UM.09 Long Term Care Ancillary Service Criteria). Sunshine Health's assessment arrived at less than 18 hours a week.

137. These task-based criteria fail to consider the actual amount of time that it takes to care for Mr. Grant, the number of times per day that a particular task must be performed, the irregularity of tasks, the need for constant supervision between tasks, or the opinions of treating physicians.

138. Sunshine Health also based its decision on the availability of voluntary care by household members that it never validated and continued to assert even after being informed otherwise.

139. Shortly after being told of Sunshine's reduction decision, Mr. Grant's mother and his treating physician both informed Sunshine orally and in writing about Mr. Grant's need for services and the limitations of household members to help with his care.

140. The 701B Comprehensive assessments for Mr. Grant revealed many errors, including a statement that Mr. Grant lives in a home "with 10 other family members." Mr. Grant was not provided with a copy of any of the 701B assessments for review until he obtained counsel for his appeal.

141. Sunshine Health's version of the LTC Supplemental assessment is included as part of its template for a Plan of Care. When the Sunshine Case Manager filled out the Plan of Care at Mr. Grant's home on January 9, 2024, the Case Manager asked Mr. Grant's mother to sign a tablet with only the signature line visible and the Case Manager told his mother she would receive a copy of the Plan of Care later. She did not see this Plan of Care until Mr. Grant obtained counsel.

142. A review of Sunshine Health's LTC Supplement assessment also revealed incorrect and missing information, including any information on a

natural support's "Limitations," "Willingness to Assist," and "Additional Responsibilities." Neither Mr. Grant's mother nor any other household members were consulted when the LTC Supplement assessment was completed.

143. AHCA's Office of Fair Hearings held a 4-hour phone hearing on May 6, 2024, over the objection of Mr. Grant's counsel as both her client and his mother had an intestinal virus.

144. The AHCA hearing officer reversed Sunshine Health's decision to reduce services, but in doing so gave no weight to the lack of improvement in Mr. Grant's condition or circumstances.

145. AHCA's Final Order failed to address the inaccuracies of Mr. Grant's 701B comprehensive assessment or the LTC Supplemental assessment.

146. The AHCA hearing officer also stated at the outset of the hearing that the Office of Fair Hearings only had jurisdiction to determine the specific type and amount of service listed in the Plan notices and could not consider the array of services needed for Mr. Grant to remain in his home.

### *Rafaela Gonzalez*

147. Plaintiff Rafaela Gonzalez is an 84-year-old woman who been enrolled in the LTC Waiver since 2022. Her managed care plan is Molina Health.

148. Ms. Gonzalez suffers from a multitude of medical conditions including Alzheimer's disease, chronic heart and kidney disorders and progressive muscle weakness.  Ms. Gonzalez is wheelchair dependent and must be physically assisted for all transfers.

149. Ms. Gonzalez requires total assistance for her care needs. She is a fall risk and must always be supervised for her health, safety and wellbeing.

150. Until her husband died in April of 2023, Ms. Gonzalez lived with her husband. She now resides alone in her own home.

151. Until her husband died, Ms. Gonzalez was receiving 32 hours of Personal Care, 10 hours of Homemaker services, and 14 hours of Adult Companion Care per week. Ms. Gonzalez's husband was also enrolled in the LTC Waiver and received long-term care services which terminated upon his passing.

152. After her husband's death, Ms. Gonzalez's family requested an additional 38 hours per week of Personal Care services. Both Ms.

Gonzalez's primary care physician and her psychiatrist provided letters to support her request for additional services.

153. A request was also submitted for emergency Respite care of 38 hours a week while the request for Personal Care services was pending. It took five days for Respite to be approved, and it was only authorized for a week.

154. Instead of increasing Ms. Gonzalez' services, Molina sent Ms. Gonzalez two NABDs, both dated May 2, 2023, reducing Ms. Gonzalez's Personal Care services from 32 to 19 hours per week, and her Homemaker services from 10 hours to 7 hours per week.

155. Ms. Gonzalez's legal representative, Lourdes Gonzalez, appealed Molina's decision. On May 3, 2023, Molina issued a NPAR stating "while we are denying the extra 28 hours per week of personal care you will still receive 42 hours personal care and 14 hours of homemaker." In essence, this was a denial of 28 hours per week of the requested Personal Care services.

156. On May 4, Ms. Gonzalez's legal representative faxed a request to Molina for a complete copy of Ms. Gonzalez's case file, but she never received it.

157. Both the NABD and the NPAR gave the same reason for the decision: "You are already receiving other services that should meet your needs." The NPAR added the statement that there was no showing of "a significant (big) change in your care."

158. Both Notices stated that the decision was based Molina policies that were never provided to Ms. Gonzalez.

159. Ms. Gonzalez's legal representative requested a fair hearing which was held on May 30, 2023. The hearing officer upheld Molina's decision to reduce Ms. Gonzalez's services to 28 hours of Personal Care per week.

160. The hearing officer heavily relied on the information in Ms. Gonzalez's 701B and LTC Supplemental assessments as well as her signed plan of care to support his decision.

161. Neither Ms. Gonzalez nor her legal representative had ever been provided with a copy of her 701B assessment or LTC Supplemental assessment prior to the hearing.

162. The 701B contained inaccurate information about her abilities and the amount of assistance she needs to complete activities.

163. The LTC Supplemental assessment also contained incorrect information and was missing information on the family's "Willingness to

Assist," and their "Additional Responsibilities." Ms. Gonzalez's family was not consulted when her LTC Supplemental assessment was completed.

164. Ms. Gonzalez's family was never able to review Ms. Gonzalez's plan of care prior to signing it. Instead, the case manager presented them with a tablet displaying only a signature line and informed them they would be sent a copy in the mail.

165. The AHCA hearing officer quoted a portion of the Medicaid rules for the authorization of personal care services offered to children under the State Plan. The quoted portion sets out a task-based criteria that allocates a certain amount of time per personal care task.

166. Despite findings of fact that Ms. Gonzalez lost supervision and companionship when her husband died, the AHCA hearing officer did not consider whether a different service, such as more Adult Companion Care, might be appropriate to address the critical lack of supervision and social enrichment resulting from the death of Ms. Gonzalez's husband.

167. With the assistance of counsel, Ms. Gonzalez submitted a new request for an additional 21 additional hours per week of Personal Care services and an additional 14 additional Homemaker hours per week.

168. Molina was put on notice that Ms. Gonzalez's assessments and plan of care needed to be corrected and requested new assessments. When

those were done on September 26, 2023, in the presence of Ms. Gonzalez's counsel, the Molina case manager stated that she did not have the authority to correct the level of care required for ADLs. At the assessment meeting, the case manager also asked Ms. Gonzalez's representative, Lourdes Gonzalez, to sign a tablet without reviewing the plan of care. On the advice of counsel, Ms. Gonzalez's representative declined to do so.

169. On October 2, 2023, Molina issued two NABDs that approved Ms. Gonzalez for an additional hour of Personal Care services per week but denied the remaining 20 hours requested and completely denied the requested Homemaker hours.

170. The NABDs fail to provide an individualized and specific reason for the decision. They simply state that Ms. Gonzalez was "already receiving other services to meet [her] needs."

171. The NABDs also state that the decision "reflects the application of Molina's approved review criteria and guidelines," but fails to specify which criteria or guidelines were relied upon and they were never provided to Ms. Gonzalez.

172. Counsel for Ms. Gonzalez filed a series of internal appeals and grievances. Ultimately, Ms. Gonzalez was approved for an additional 12

hours of Adult Companion Care and an additional 26 hours of Personal Care services per week.

173. Ms. Gonzalez's family currently pays out of pocket for additional hours of care during nighttime hours.

### *CJT*

174. Plaintiff CJT is a 65-year-old man who has been enrolled in the LTC Waiver since November 2016. His managed care plan is Sunshine Health.

175. CJT has a history of schizophrenia and is now diagnosed with schizoaffective disorder (bipolar type), severe anxiety disorder exacerbated in social situations, and major neurocognitive disorder.

176. CJT requires assistance with all his care needs. He has a difficult time with directions of more than one step and requires constant supervision and prompting to complete tasks.  He cannot be left alone for more than a couple of hours.

177. CJT resides in an apartment with his sister, CT.

178. CT is 72 years old and also takes care of an older sister with disabilities who lives in her own apartment.

179. Up until December 12, 2023, CJT was authorized to receive 9 hours per week of Adult Companion Care services, along with 30 hours per week of other direct care services.

180. Sunshine Health attempted to reduce his Companion hours in both 2020 and 2022 but reversed the decisions after intervention by a legal aid organization.

181. On December 12, 2023, Sunshine Health issued a NABD terminating CJT's 9 hours of Adult Companion Care effective December 26, 2023.

182. CJT did not receive the NABD until December 26, 2023.

183. Upon receipt of the notice, CT immediately requested an appeal and continuation of services via email. Nonetheless, services were terminated and not reinstated for several days.

184. CJT's treating psychiatrist provided written statements to Sunshine stating that Adult Companion Care services are needed as treatment of CJT's disorders and that without this support, CJT is at higher risk for severe illness and rehospitalization.

185. In a NPAR dated December 29, 2023, Sunshine upheld its decision to terminate services.

186. The NPAR was not received by CJT until January 10, 2024. That Notice states that services would be terminated effective December 29, 2023, the day the notice is dated.

187. Both the NABD and the NPAR fail to provide an individualized and specific reason for the decision. They simply state that the services would terminate because CJT was "not at risk of social isolation" because his primary caregiver could provide all necessary supervision and socialization.

188. Both Notices cite Sunshine Health Policy LT.UM.09 Long Term Care Ancillary Service Criteria as support for their decision but fail to specify what section of the 25-page policy they relied on.

189. Because it was taking so long to receive written notices, CT asked Humana's case manager to send notices to her via email. She was told that this was not possible.

190. After being told that CJT's appeal was denied, on January 8, 2024 (before CJT received written notice of Sunshine's appeal decision), she requested a fair hearing and asked for continuation of services.

191. CJT's services were terminated. CJT sought reinstatement of services pending resolution of the fair hearing from both Sunshine and AHCA Office of Fair Hearings.

192. To get answers on why CJT's services were terminated, CT called the Plan's Grievance and Appeal Department. She was kept on hold for 8 hours before being disconnected.

193. CT also filed a motion with AHCA Office of Fair Hearings asking for reinstatement of services. The AHCA hearing officer entered an Order on March 29, 2024, declining to address the issue of reinstatement, ruling that "the Office of Fair Hearings lacks jurisdiction over Petitioner's request for continuation of benefits pending the outcome of the Fair Hearing."

194. CT requested CJT's complete case file, and his attorney also made multiple requests for his complete case file. It took Sunshine six months and the intervention of CJT's counsel to fulfill the request.

195. At care planning meetings with Sunshine's case manager, CT and CJT have routinely been asked to sign the care plan on a tablet without being able to access anything but the signature page.

196. CJT was not provided a copy of any 701B assessment to review until he retained counsel. The 701B had many mistakes, including inaccurate statements regarding CJT's current mental status.

197. Sunshine based its decision on the availability of voluntary care by CJT's sister that it never validated and continued to assert even after being informed otherwise.

198. CJT's LTC Supplemental assessment contained misinformation on the availability of his sister to provide voluntary care.

199. Sunshine's decision to eliminate Adult Companion Care because CJT lives with his sister and is not "socially isolated" is a limitation on Adult Companion Care that is not related to his actual needs. Adult Companion Care is intended to provide "social enrichment of a functionally impaired enrollee." If Adult Companion Care is only available when "social isolation" is present, any enrollee who does not live alone would be ineligible for that service.

200. Sunshine's decision to reduce previously authorized services did not consider that CJT's condition has not improved, but in fact has deteriorated, when making its decision to terminate services that have previously been authorized as medically necessary.

201. Sunshine reversed its decision to terminate Adult Companion Care a week before the scheduled fair hearing. Services were not authorized retroactive to the date of termination, however, until intervention by CJT's counsel.

### Plaintiff Daniel Gray

202. Plaintiff Daniel Gray is a 38-year-old man who has been enrolled in the LTC Waiver since 2017. His managed care plan is Humana.

203.  Mr. Gray was in an accident when he was 19 years old that left him quadriplegic. He is unable to move any part of his body below the shoulders. Complications from his condition include muscle spasms, urinary tract infections, skin breakdown, bowel impaction, poor renal function, and dysreflexia (life-threatening heart and blood pressure reactions.)

204. Mr. Gray requires care and supervision 24 hours a day. He needs total physical assistance for all typical activities of daily living, but he also requires additional support to manage or prevent spasms, bed sores and other conditions. Transferring him in and out of bed requires two people for Mr. Gray's safety and the safety of his caregivers.

205. Mr. Gray lives with his 73-year-old mother and 85-year-old father. His father is diagnosed with asbestos-related lung cancer and advanced diabetes.

206. Mr. Gray is authorized to receive 42 hours per week of Personal Care and 14 hours per week of Homemaker services. His parents have provided voluntary care for the remaining 116 hours of the week, but his father is now on oxygen and unable to assist.

207.  On April 29, 2024, Mr. Gray requested an additional 42 hours per week of care due to the loss of assistance from Mr. Gray's father and the

strain placed on his elderly mother who now cares for both her husband and her son.

208. Humana issued a NABD on May 6, 2024, denying all the requested services. In the section on "facts we used to make the decision," the NABD states that Mr. Gray can make his needs known, he does not wander, and he has not been recently hospitalized. The NABD also recognizes that he needs help transferring and with other ADLs and IADLs. It is suggested that the hours he currently receives should be enough if divided into shifts. The availability of his voluntary caregivers is not mentioned.

209. The Notice also states that the decision reflects the application of Humana's "approved review criteria and guidelines," which are not otherwise identified, nor have they been provided.

210. The NABD gives only a post office box address for submission of written requests. Mr. Gray sent an appeal request to the listed address with a detailed description of Mr. Gray's daily care needs and an explanation of the medical and physical limitations of his parents. He had to resubmit this again a month later after a Humana represented was contacted about the status of the appeal and stated that the initial appeal had not been received.

211. A NPAR was issued on July 10, 2024, once again denying the entire request.

212. Like the earlier notice, the NPAR listed symptoms Mr. Gray does not have (no trouble thinking clearly or remembering things), along with an acknowledgment that he has "several medical problems" and needs "help" with ADLs and IADLs. It also states that his father "provides natural support.".

213. Both Notices state that facts used to make the decision include Mr. Gray's lack of certain symptoms, like wandering or cognitive limitations. These statements are misleading in that incorrectly imply that certain symptoms must be present to justify denial of Personal Care.

214. The NPAR also recommends placement in an assisted living facility if Mr. Gray needs 24/7 care. Mr. Gray was not seeking authorization of 24/7 care, but this statement incorrectly suggests that 24/7 care is not available to someone who chooses to live in the family home.

215. Despite being advised that Mr. Gray's father is unable to provide care for serious medical reasons, Humana continued to state that he was available as a "natural support."

216. Mr. Gray submitted a written request for his complete case file on July 17, 2024. Another written request, titled "REQUEST FOR COMPLETE COPY OF FILE," was made on July 23rd by Mr. Gray's counsel.

217. In response to the case file request, Humana sent a letter to Mr. Gray dated July 23, 2024, stating that four documents were enclosed: Mr. Gray's own appeal request, the NABD, a falls risk assessment, and "Florida Long-Term Care (LTC) pages." There were no attachments or enclosures.

218. Humana sent a letter to Mr. Gray's counsel dated July 31, 2024, acknowledging receipt of her "letter" but interpreting it as an appeal request. Mr. Gray had already appealed and been notified of denial. No mention was made of the request for Mr. Gray's case file.

219. Mr. Gray's counsel finally received some case file documents on August 23, 2024, after filing an AHCA Complaint on August 8th and emailing Humana's counsel on August 9th. However, these documents were Humana's own fair hearing evidence packet and failed to include any communication notes or any but the most recent assessments.

220. Mr. Gray had not seen a copy of his 701B assessment or LTC Supplemental assessment until he received the fair hearing evidence.

221. The 701B assessment includes information about changes in Mr. Gray's father's health, his mother's extensive caregiving (over 14 hours a day) and resultant strain, and her own decline in health. At the same time, the assessment reports that the caregiver is not in crisis.

222. The LTC Supplemental assessment also records that Mr. Gray's father was ill, that the mother is caring for Mr. Gray 14 hours a day and has physical restrictions but is not in crisis. It contains multiple errors and omissions.

223. Mr. Gray's father has not been asked any of the questions required for a LTC Supplemental assessment. Mr. Gray's mother was asked some of the questions on the form but was never told that she was being assessed for her ability to provide unpaid, voluntary care.

224. Mr. Gray's counsel continued to push for production of Mr. Gray's complete case file. It was never provided, but on August 28, 2024, Humana's counsel advised Mr. Gray's counsel that Humana would authorize the requested Personal Care hours.

225. Mr. Gray will begin receiving Personal Care services four months after the initial request was made.

### *Plaintiff Branden Petro*

226. Plaintiff Branden Petro is a 22-year-old man who has been enrolled in the LTC Waiver since 2023. His managed care plan is Simply Healthcare.

227. Mr. Petro has been diagnosed with autism and Alper's Syndrome, a rare genetic mitochondrial disorder that leads to dementia, liver failure, and

seizures. As a result of the disease, he experiences global brain atrophy, severe epilepsy that is medication resistant, ulcerative colitis, dysphasia, hypoxemia, and early onset dementia. He is nonverbal and has no way of communicating.

228. Mr. Petro requires physical assistance with all activities of daily living. He has difficulty swallowing and needs to be suctioned to prevent aspiration. He is incontinent. He cannot be left alone due to seizures that can require oxygen, suctioning, and emergency medication.

229. Because Mr. Petro's autism diagnosis makes him sensitive to touch and his brain atrophy interferes with his ability to control his movements, many care tasks require the assistance of multiple people, as his body and head must be held still to prevent harm.

230. Mr. Petro's care needs require the services of a skilled nurse. He has a complex medication regimen, and his neurological protocols can only be attended to by a qualified professional. He is at risk for diabetes, strokes, and heart disease.

231. Mr. Petro's mother, Renee Hanania, is also his co-Guardian Advocate. Mr. Petro lives with his maternal grandparents who are his primary caregivers and co-Guardian Advocates.

232. Mr. Petro's mother has breast cancer and receives treatment at a hospital two to three times per week. She does not live with Mr. Petro at this time due to concerns that she might expose him to an illness due to her frequent hospital visits.

233. Since his enrollment in the LTC Waiver and even prior to that when he was enrolled in State Plan Medicaid, Mr. Petro was authorized to receive 70 hours per week of skilled nursing care.

234. Mr. Petro's legal representatives have never been provided a copy of any 701B or LTC Supplemental assessment to review. When Simply case managers have come to his home to conduct these assessments, they rarely stay longer than 10 minutes.

235. Mr. Petro's legal representatives have never been shown a plan of care to review prior to signing. However, Mr. Petro's grandfather has been asked to sign the case manager's tablet to show that he came to the household.

236. By NABD dated December 3, 2023, Simply Healthcare attempted to terminate all of Mr. Petro's Attendant Nursing Care services. In the section on "facts we used to make our decision," the NABD acknowledged that Mr. Petro has seizures, autism, and is on oxygen but stated that he did not have wounds nor was he on breathing tube. The NABD purported to end services

as of December 1, 2023, two days before the NABD was dated. As a result, Mr. Petro did not receive nursing care services for approximately 2 days.

237. The NABD cited the Florida Medicaid Private Duty Nursing Services Coverage Policy, sections 4.0-4.2, and the Florida Medicaid SMMC LTC Coverage Policy. The NABD does not specify on which part of the 22-page LTC Coverage Policy the Plan relied.

238. After an internal appeal and documentation from health care providers, the decision to terminate Attendant Nursing Care was reversed.

239. Six months later, on June 3, 2024, Simply Healthcare issued another written NABD terminating Mr. Petro's Attendant Nursing Care but authorizing the same amount of unskilled Personal Care.

240. Like the previous notice, this NABD also suggested that Attendant Nursing Care was not available because of conditions that Mr. Petro did not have: a feeding tube, complex wound care or complex airway care. The NABD did not mention Mr. Petro's care needs based on the conditions he does have: seizures, swallowing disorders, low oxygen levels, and other complex medical conditions that require monitoring.

241. Mr. Petro's mother immediately appealed and requested that services continue pending resolution of the appeal.

242. Mr. Petro's primary care physician requested a peer-to-peer reconsideration with Simply Healthcare and provided information to support his need for Attendant Nursing Care.

243. Over his treating physician's objection, Simply Healthcare proceeded with the reduction in services. On July 17, 2024, Ms. Hanania was briefly informed via email that the termination of Attendant Nursing Care was upheld. Ms. Hanania immediately requested a fair hearing.

244. On July 18, 2024, Simply Healthcare issued a Notice of Plan Appeal Resolution ("NPAR"). The NPAR incorrectly describes the termination as a "denial." The NPAR acknowledges that Mr. Petro has seizures but does not address the risk of aspiration or his other complex medical issues.

245. When Ms. Hanania requested a fair hearing through AHCA's Medicaid Hearing Unit on June 17, 2024, she also requested continuation of services during the fair hearing process. Receipt of the request to continue services was confirmed by email.

246. On July 18, 2024, Mr. Petro's nursing provider, Exceptional Healthcare Services, contacted Ms. Hanania to inform her that because Simply Healthcare had not paid for the Attendant Nursing Care being provided by Mr. Petro's nurse since June 3, they would have to bill her for

the past due payments and would no longer be able to send a nurse to care for Mr. Petro.

247. Ms. Hanania filed an AHCA complaint the same day, and on July 19, Simply Healthcare authorized services through July 26, 2024. Ms. Hanania had to file a second AHCA complaint for services to be extended to August 25, 2024.

248. On June 7, 2024, Ms. Hanania made a request for Mr. Petro's case file by email to the case manager. This request was also sent to the email address for Simply Healthcare's Medicaid Grievance and Appeals Coordinator listed in its member handbook.

249. Over a month later, on July 15, 2024, the request for a case file had not been fulfilled. Ms. Hanania again sent the request, and this time included the supervisor of Nursing Appeals who was handling Mr. Petro's appeal. She responded that she was not aware of the request and would prepare the case file. Ms. Hanania received a small portion of Petro's case file by mail on July 25, 2024. The documents sent did not include any care plans or communications notes, and only provided the most recent 701B comprehensive assessment.

250. On July 30, 2024, Petro's June 17th Fair Hearing Request was dismissed due to a typo in the Office of Fair Hearing's email address when

Mr. Petro's Designation of Authorized Representative was submitted. Ms. Hanania requested reconsideration, offering evidence of the mistake, and also filed a new fair hearing request.

251. Ms. Hanania never received anything else from the Office of Fair Hearing, either by mail or by email.

252. Once Mr. Petro obtained the assistance of counsel, the Plan overturned its decision to terminate his services and reinstated all 70 hours of Attendant Nursing Care services.

253. Simply Healthcare makes service reauthorization decisions every six months, which will continue to subject Mr. Petro to its flawed process and arbitrary criteria at least semiannually.

### *AHCA's Failures Harm Plaintiffs*

254. Plaintiffs have been subjected to decisions on critical home health services that ignore their actual care needs using either arbitrary limitations or inadequate assessments, or both.

255. Plaintiffs have been subjected to repeated due process violations that leave them with insufficient information to determine whether or how to meaningfully challenge Plan decisions on needed services.

256. Plaintiffs or their caregivers have spent many hours frantically trying to respond to short deadlines, seeking to understand why services

were reduced or denied, attempting to provide documentation without knowing exactly what is needed, and on long phone calls with Plans or providers. All Plaintiffs have had to prepare for fair hearings and two have had to attend contentious evidentiary hearings. The stress of these efforts to maintain or access medically necessary services is an unnecessary harm to the person with significant disabilities and their overwhelmed caregiver.

257. Defendant has not corrected these due process violations.

258. Defendant has not stopped the use of flawed decision-making on direct care services.

259. Any time Plaintiffs need additional services, have a quarterly or annual review, have an impromptu review initiated by a Plan, or undergo a reauthorization, they will continue to be subject to AHCA's flawed process and arbitrary criteria. Until those deficiencies are corrected, all Plaintiffs remain at risk of not receiving services that are sufficient to enable them to live safely in their homes and avoid institutionalization.

260. All Plaintiffs are in the precarious position of relying on substantial support by voluntary caregivers whose availability is increasingly unreliable over the long term. When those supports deteriorate, AHCA's failures to address deficiencies places Plaintiffs at risk of unnecessary institutionalization.

261. Marc Grant's mother voluntarily provides for his intensive care needs 12 hours a day. She has her own medical issues that cause joint pain and chronic fatigue. Mr. Grant sleeps in the room with her so that she can monitor him at night. Due to his severe sleep disorder, she spends many nights awake with him. She also cares for three minor grandchildren who have disabilities.

262. Rafaela Gonzalez's daughter-in-law, Lourdes Gonzalez, voluntarily provides help with medications, doctor appointments (including transportation), shopping, and coordination with health care providers. Lourdes Gonzalez lives in her own home and takes care of her four grandchildren. Family members privately pay for Rafaela Gonzalez's care 12 hours a day, but this is not financially sustainable.

263. CJT's sister is 72 years old and voluntarily provides for his care and supervision all but 39 hours a week. She also provides care for her older disabled sister and is the only family member available to provide care for both her siblings.

264. Since his accident 19 years ago, Daniel Gray has been voluntarily cared for primarily by his mother and father. Mr. Gray's condition requires caregivers who can physically manage transfers, repositioning, and assistance with mobility and hygiene. His father is now unable to provide

care and needs care himself, and his mother is in her 70's with her own health needs.

265. Branden Petro's caregivers are his grandparents, Naella and Mazen Ayyoub. He must be supervised 24 hours a day due to his seizures and other medical conditions. During the hours when Mr. Petro does not have a nurse at the home, the grandparents take turns supervising him throughout the night and must catch up on sleep and other household or personal tasks while Mr. Petro's nurse is there. Without the assistance of the nurse, Mr. Petro's grandparents would have difficulty attending to his needs and would not be able to get an adequate amount of sleep.

266. Every Plaintiff meets the institutional level of care for nursing facility services, which is a mandatory Medicaid service under Florida law. § 409.905(8), Fla. Stat. (2023). In a nursing facility, Plaintiffs would be provided with around the clock access to home health aides and supervision by nurses. However, the provision of medically necessary services in their homes would alleviate Plaintiffs' need to access services in nursing facilities.

267. Every Plaintiff has been threatened with reduction, termination or denial of critical direct care services. They and their caregivers have struggled to understand the reasons for these decisions and have tried to provide information to support the need for services without success. Without

the intervention of attorneys, they would very likely not be receiving these services. However, the pattern of lack of information, disinformation, and arbitrary decision-making has not been corrected and continues to place all Plaintiffs at serious risk of institutionalization:

268. The direct care services Plaintiffs are currently receiving are critical to their health and safety. Without these supports, they will be unable to perform daily activities and household tasks, and their ability to live independently will be diminished. If their services are improperly reduced, terminated, or denied, it is likely that they will be hospitalized or forced to seek less integrated living arrangements, such as nursing facilities or other congregate living settings.

269. Plaintiff Grant has several degenerative genetic disorders which, as predicted, have resulted in a deterioration of his condition and increased need for support. He requires total physical assistance and cannot be left unsupervised. He is a constant fall risk. When his services were threatened to be reduced by almost half, his legal representative and his physicians went to great lengths to explain his complex care needs and the strain on his caregiver with no change in result. If this pattern continues unchecked, Mr. Grant's safety is threatened such that he would have to go to a nursing facility or hospital to receive the consistent care and supervision he needs.

270. Plaintiff Gonzalez has Alzheimer's disease and multiple medical conditions. She requires total assistance for her care needs including transfers and mobility and is a fall risk. She must be supervised at all times. When her husband's death resulted in loss of supervision, she was unable to receive adequate or timely Respite and had her initial request for more care met with a reduction in current services. It took seven months and the assistance of counsel to receive critical direct care services needed to allow her to remain in her home.

271. Plaintiff CJT has suffered three attempts to terminate his Companion service despite a deterioration in his condition. CJT's treating psychiatrist has consistently advised that these services are an important component of CJT's treatment plan and that their termination places CJT at greater risk for decompensation and hospitalization.

272. Plaintiff Gray cannot move from his neck down and cannot be left alone. He requires total care for his most basic needs. His caregivers must be capable of providing intensive physical assistance to transfer, reposition, or meet his hygiene needs. When Mr. Gray was denied direct care services to cover voluntary care that his parents have less capacity to provide, other family members had to leave their own homes and families to provide temporary help while he struggled to make his needs known. Delays or

reductions in direct care threaten his health and safety such that he would have to enter a nursing facility to receive the care that he needs.

273. Plaintiff Petro must be supervised at all times due to the risk of seizure, aspiration, or other medical emergencies. His caregivers must be specially trained to attend to his complex medical needs. He has twice in the last year been threatened with termination of his nursing services. Before Mr. Petro had the services of a skilled nurse, he was in and out of the hospital due to various uncontrolled medical issues. The daily supervision and assistance of a trained nurse helped stabilize his condition and prevented additional hospitalizations.

274. In addition to the harm caused by being forced to move from their home to receive appropriate care, institutionalization would have extreme consequences for Plaintiffs.

275. Mr. Grant is immunocompromised due to his heart transplant, autoimmune disorder, and deteriorating health, making him extremely vulnerable to infections and other contagious diseases that are more easily contracted in an institutional setting. For Mr. Grant, catching a cold can result in serious health consequences.

276. Institutionalization for people with dementia, like Ms. Gonzalez, is highly destabilizing and can result in rapid decline. In addition, any

congregate living facility increases the risk of communicable diseases that can be fatal to the elderly.

277. CJT has severe anxiety triggered in new settings and around strangers. This anxiety becomes so overwhelming that he will scream, shut down, or run away when faced with new situations and people. Placement in an institutional setting would cause his condition to deteriorate and endanger himself and others.

278. Mr. Gray's quality of life and mental health are contingent on the options that he has in his family home for activities, socialization, and assistive technology that his family make sure he receives.

279. Mr. Petro's inability to communicate places him at high risk for abuse and neglect in an institutional setting. He has been neglected while in a congregate care facility in the past.

280. Plaintiffs' service reductions or denials are directly traceable to the actions of AHCA. The risk of institutionalization that Plaintiffs face can be redressed by addressing AHCA's actions.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Constitutional Due Process

281. The allegations of paragraphs 1 through 280 are incorporated into

this claim as though fully set forth herein.

282. The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits states from depriving any person of life, liberty, or property, without due process of law.  U.S. Const. amend. XIV § 1.

283. Plaintiffs have a constitutionally protected property interest in Medicaid benefits, including services provided through the LTC Waiver.

284. The fair hearing system must meet the Constitutional due process standards which are set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970).  *See* 42 C.F.R. § 431.205(d).

285. Due process requires that an enrollee be given the opportunity to be heard "at a meaningful time and in a meaningful manner"; i.e., "an adequate hearing before termination" of benefits. *Goldberg*, 367 U.S. at 261, 267.

286. Notice is a fundamental requirement of due process, and recipients of public benefits must receive "timely and adequate notice detailing the reasons for a proposed termination." *Goldberg*, 397 U.S. at 267-68.

287. Notice must be timely so that enrollees can appeal before the reduction or termination of services occurs and can request continuation of services pending a fair hearing.

288. To be adequate, notice must inform enrollees of the legal and factual basis for the adverse decision, and, where relevant, explain what information is lacking or how enrollee failed to meet a required standard.

289. For participation in a fair hearing to be meaningful, an enrollee must be provided with sufficient information to understand how decisions were made in their case and to cross-examine Plan witnesses.

290. The actions and inactions of AHCA's Office of Fair Hearings prevent enrollees from having a forum for a meaningful appeal of an array of issues that impact their ability to access their Medicaid benefits or to prevent the loss of those benefits.

291. AHCA, as the single point of accountability for Florida's Medicaid Program, and Defendant Weida as AHCA's Secretary, has failed to provide appropriate oversight to ensure Plaintiffs receive adequate notice of service authorization decisions, continuation of service pending an appeal and fair hearing, and sufficient information to provide a meaningful opportunity to be heard.

292. Defendant's failures create a significant risk of erroneous deprivation to Plaintiffs.

293. Defendant would not be unduly burdened by ensuring that enrollees receive adequate and timely notice, continuation of benefits

pending appeal and fair hearing, and sufficient information for a hearing to be meaningful, since these are already required as part of the program design.

294. Plaintiffs have suffered harm and continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate result of Defendant's due process violations.

## Second Claim for Relief

### Medicaid Act Fair Hearing Requirements

295. The allegations of paragraphs 1 through 280 are incorporated into this claim as though fully set forth herein.

296. Defendant Weida's operation and administration of the LTC Waiver Program is subject to the requirements of the federal Medicaid Act, including but not limited to 42 U.S.C. § 1396a(a)(3) and 42 C.F.R. § 438.50(a).

297. The Medicaid Act requires all state programs to "provide for granting an opportunity for a fair hearing before the state agency to any individuals whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness.  42 U.S.C. § 1396a(a)(3).

298. Defendant has failed, and continues to fail, to:

   a. Ensure enrollees are provided timely, adequate notice of

the basis for service authorization decisions and plan appeal resolutions;

      b. Ensure enrollees receive continued services pending appeal; and

      c. Ensure enrollees have access to their case file prior to the fair hearing.

299. These failures deprive Plaintiffs of their right to a fair hearing under 42 U.S.C. § 1396a(a)(3).

300. Plaintiffs have suffered harm and continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate result of Defendant's failure to comply with the notice and hearing requirements of the Medicaid Act.

### Third Claim for Relief

### Americans with Disabilities Act

301. The allegations of paragraphs 1 through 280 are incorporated into this claim as though fully set forth herein.

302. Plaintiffs are "qualified individual[s] with a disability" within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), in that they (1) have a physical impairment that substantially limits one of more major life activities; and (2) meet the essential eligibility

requirements for both managed medical assistance and long-term care under Florida's Medicaid program.

303. Defendant Weida, as Secretary of AHCA, is a public entity pursuant to 42 U.S.C. § 12131(1) and therefore subject to the requirements of the ADA.

304. Defendant violates the ADA by:

a. failing to establish or enforce adequate requirements that Plans provide an array of services that address the total long-term care needs for Plaintiffs to remain healthy and safe in the community. Plaintiffs remain at risk of unnecessary institutionalization until such time as sufficient requirements and enforcement are in place; and

b. using criteria and methods of administration that discriminate against Plaintiffs on the basis of disability and substantially impair the LTC Waiver Program's goal of enabling enrollees to live in the community and avoid institutionalization.

305. Defendant's administrative policies, practices, and procedures have the effect of placing Plaintiffs at a serious risk of segregation and institutionalization.

306. Defendant fails to ensure that LTC Waiver Program enrollees have access to home care services that are necessary for them to live safely

in their homes or communities.

307. Plaintiffs have suffered harm and continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate result of Defendant's violations of the Americans with Disabilities Act and its implementing regulations.

## Fourth Claim for Relief

### Section 504 of the Rehabilitation Act

308. The allegations of paragraphs 1 through 280 are incorporated into this claim as though fully set forth herein.

309. Plaintiffs are "qualified individual[s] with a disability" within the meaning of the Rehabilitation Act, 29 U.S.C. § 794.

310. Defendant Weida, as Secretary of AHCA, is subject to the requirements of the Rehabilitation Act, 29 U.S.C. § 794, because AHCA receives federal financial assistance through the Medicaid Program.

311. Defendant violates Section 504 by:

a. failing to establish or enforce adequate requirements that Plans provide an array of services that address the total long-term care needs for Plaintiffs to remain healthy and safe in the community. Plaintiffs remain at risk of unnecessary institutionalization until such time as sufficient requirements and enforcement are in place; and

b. using criteria and methods of administration that discriminate against Plaintiffs on the basis of disability and substantially impair the LTC Waiver Program's goal of enabling enrollees to live in the community and avoid institutionalization.

312. Defendant's administrative policies, practices, and procedures have the effect of placing Plaintiffs at a serious risk of segregation and institutionalization.

313. Defendant fails to ensure that LTC Waiver Program enrollees have access to home care services that are necessary for them to live safely in their communities.

314. Plaintiffs have suffered harm and continue to suffer harm, for which there is no adequate remedy at law, as a direct and proximate result of Defendants' violations of Section 504 of the Rehabilitation Act and its implementing regulations.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.      Declare that the Defendant's custom and practice of failing to ensure that Plans provide timely and adequate notice of service reductions, denials, and terminations constitutes a violation of the Due Process Clause.

B.     Declare that Defendant's arbitrary limitations on its own fair hearing jurisdiction constitute a violation of the Due Process Clause.

C.     Declare that Defendant's custom and practice of failing to ensure that Plans provide reliable and adequate information about access to plan services and service authorization decisions prevent Plaintiffs from having a meaningful opportunity to challenge Plan decisions in violation with the requirements of the Due Process Clause.

D.     Declare that Defendant fails to comply with fair hearing requirements in violation of the Medicaid Act.

E.     Declare that Defendant's custom and practice of allowing the use of arbitrary limitations on services and of failing to ensure that Plans provide needed home care services places Plaintiffs at risk of unnecessary institutionalization and is in violation of Title II of the American with Disabilities Act and Section 504.

F.     Declare that Defendant's use of criteria and other methods of administration that defeat the LTC Waiver Program's goals of enabling enrollees to live in the community and avoid institutionalization violates the Americans with Disabilities Act and Section 504.

G.     Enter an injunction ordering Defendant to:

i.     Ensure that Plans provide timely and adequate notice before denial, reduction or termination of LTC Waiver services;

ii.    Prohibit Plans from placing arbitrary limits on services;

iii.   Ensure Plans fully and accurately assess LTC Waiver enrollees' care needs and the availability of natural supports and make service authorization decisions on that basis;

iv.    Ensure that Plans do not create arbitrary barriers to delay the provision of needed services and that AHCA hearing officers consider the array and amount of services needed to meet the goal of the LTC Waiver; and

v.     Ensure that AHCA's fair hearing process provides a meaningful review of managed care plan decision-making, including but not limited to all issues pertaining to requested services, adequacy of notices, continuation of services that are reduced or terminated, information needed to meaningfully challenge adverse decisions, and the appropriate array of services or amounts of services that would meet the enrollee's stated needs.

H.     Waive the requirement for the posting of a bond as security for the entry of preliminary relief.

I.     Award Plaintiffs their reasonable attorneys' fees, litigation expenses, and costs.

J.     Grant all such other and further relief as the court deems to be just and equitable.

Date: September 23, 2024

Respectfully submitted,

*/s/ Nancy Wright*
Nancy E. Wright, Fla. Bar No. 309419
Trial Counsel for the Plaintiff
Law Office of Nancy E. Wright
3231 NW 47th Place
Gainesville, FL 32605
(352) 871-8255
newright.law@gmail.com

Chelsea Dunn, Fla. Bar No. 1013541
Chelsea.Dunn@southernlegal.org
Jodi Siegel, Fla. Bar No. 511617
Jodi.Siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601-4113
(352) 271-8890

Jocelyn J. Armand, Fla. Bar No. 0044264
Jarmand@legalservicesmiami.org
Jeffrey M. Hearne, Fla. Bar No.512060
JHearne@legalservicesmiami.org
Melissa Pender Fla. Bar No. 1036008
MPender@legalservicesmiami.org
Legal Services of Greater Miami, Inc.
4343 West Flagler Street, Suite 100
Miami, FL 33134
(305) 438-3809